**Kenneth C. HOLLEY, Respondent,**

v.

**MISSOURI PACIFIC RAILROAD
COMPANY and Union Pacific
Railroad Company, Appellants.**

**No. 62614.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Nov. 16, 1993.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 16, 1993.

Application to Transfer Denied
Jan. 25, 1994.

Dan Howe Ball, James W. Erwin, St. Louis, for appellants.

Drew C. Baebler, Jerome J. Schlichter, St. Louis, for respondent.

CRAHAN, Judge.

Missouri Pacific Railroad Company and Union Pacific Railroad Company ("Defendants") appeal from a $1,250,000.00 judgment entered against them pursuant to a jury verdict in favor of their employee Kenneth Holley ("Plaintiff") in an action brought pursuant to the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 (FELA) for injuries he sustained in installing a sheet metal hood on a railroad locomotive at Defendants' repair shop. On appeal, Defendants assert four points of error based on (1) the trial court's refusal of their tendered instruction on mitigation of damages; (2) its refusal to modify MAI 24.01 to submit Defendants' knowledge of the conditions which led to Plaintiff's injury; (3) admission of testimony that Plaintiff had suicidal thoughts; and (4) admission of evidence of Plaintiff's family status. We affirm.

Plaintiff was employed by the Defendants as a boilermaker at their repair facility in North Little Rock, Arkansas. In that capacity, Plaintiff's principal duties involved sheet metal fabrication and repair, including removal and installation of various kinds of sheet metal coverings on diesel locomotives.

On January 2, 1990, Plaintiff and fellow boilermaker Gary Zulfer were instructed to install a hood on a locomotive manufactured by General Motors known as a model GP–38. The hood consisted of a piece of sheet metal formed to fit over the locomotive's diesel engines, generator, air filter and other internal mechanical parts.

In order to install a hood, it must be lowered onto the body of the locomotive with a crane. The hood has eleven holes drilled in its edges by the manufacturer, four positioned vertically on each side and three across the top. The boilermakers must line up the holes in the hood with corresponding holes on the locomotive. A punch is used to line up the holes. A bolt is then inserted through each hole and fastened with a nut and lock washer. The bolt is tightened with a wrench. It is not possible to tighten the bolts with one hand.

Plaintiff inserted the bolts on the right side of the hood while Zulfer inserted the

bolts on the left. The space inside the locomotive where Plaintiff and Zulfer had to work was very tight. There were only about nine inches between the filter housing and the bulkhead in which to work.

The middle bolt in the hood is approximately three feet inside the compartment. Zulfer tried to insert the middle bolt but was unable to reach it from where he was. Plaintiff then attempted to insert the middle bolt by crawling up into the space between the air filter and the bulkhead. He then laid on his back across the top of the blower with his feet braced against another part of the locomotive. As he was lying in this awkward position and attempting to reach back over his head to insert the bolt, Plaintiff felt a sharp pain in his shoulders and neck. Plaintiff got down from the locomotive and told Zulfer he was in pain. Zulfer testified that Plaintiff's shoulder was cocked in the air and that it was obvious he was in pain.

Plaintiff reported the incident to his supervisor and told him he thought he had pulled something loose in his back. Plaintiff came back the next day and tried to work but the pain was too bad. Plaintiff went to see Dr. Ghormley in Conway, Arkansas and was put on a pain reliever and taken off work.

Dr. Ghormley later referred Plaintiff to Dr. Martinez, a chiropractor. Both doctors recommended restrictions on the amount of weight Plaintiff would be required to lift and Dr. Martinez recommended that Plaintiff avoid climbing.

Plaintiff returned to work for a few months in 1990 but was unable to perform his regular duties due to the pain he was experiencing. In August, 1990, Plaintiff met with William Jacobs, Manager of Locomotive Maintenance, and Eugene Webb, a union representative, to see about obtaining a light duty position with the railroad. Plaintiff testified that Jacobs told him there was no light duty available and that he should go home until a doctor released him to full duty.

In November, 1990, Plaintiff went to St. Louis for treatment from Dr. George Schoedinger, an orthopedic surgeon. Dr. Schoedinger diagnosed Plaintiff's condition as a herniated nucleus pulposus of the cervical disc at the C5–6 level. In Dr. Schoedinger's expert opinion, this injury was caused by the incident which occurred on January 2, 1990. After a period of conservative treatment which proved unsuccessful, Dr. Schoedinger performed a cervical fusion in April, 1991 in an attempt to relieve Plaintiff's discomfort. The operation involved removal of disc material and fusion of the bones with bone obtained from a bone bank, thereby permanently immobilizing part of Plaintiff's neck.

Dr. Schoedinger felt that the operation was successful in that it reduced or eliminated most of Plaintiff's symptoms. Dr. Schoedinger felt that Plaintiff was capable of performing light to medium work but advised Plaintiff against unrestricted heavy work. Dr. Schoedinger recommended that Plaintiff seek some employment that would not require heavy lifting or other stressful use and told Plaintiff that the injury would probably preclude his return to railroad employment. Based on his general familiarity with the duties and activities of a boilermaker, and his review of the union agreement, photographs, Defendants' rules regarding physical requirements for boilermakers and the depositions of railroad officials, Dr. Schoedinger opined at trial that it would be "ill advised" and "foolish" for Plaintiff to return to work as a boilermaker.

After Dr. Schoedinger recommended that Plaintiff seek non-railroad employment, Plaintiff asked that he be referred to a vocational rehabilitation specialist. Dr. Schoedinger referred Plaintiff to Dr. Samuel Bernstein, a licensed psychologist and rehabilitation specialist in St. Louis. Dr. Bernstein interviewed Plaintiff and Plaintiff's wife and also arranged for physical capacity testing at Washington University Medical Center. This testing disclosed that Plaintiff experienced significant discomfort after three repetitions of lifting 10 pound weights over his head and had pain in the upper thoracic and lower cervical regions when pushing 20 pounds.

Dr. Bernstein concluded that Plaintiff should not return to work as a boilermaker due to the heavy lifting and overhead work required of boilermakers. Instead, Dr. Bernstein recommended that Plaintiff seek

lighter work, such as security or janitorial work, although such jobs would not pay as well or have comparable fringe benefits. Dr. Bernstein opined that Plaintiff would have a difficult time obtaining employment because he had only an eighth grade education and would be competing against younger, better educated people who do not have the same injuries or family responsibilities as Plaintiff.

On Dr. Bernstein's advice, Plaintiff met with the Arkansas Division of Employment and began working toward obtaining a GED to enable himself to find other employment. At the time of trial, Plaintiff had been unsuccessful in finding other employment, despite numerous applications to various companies including service stations, food stores, discount stores and factories. He was told by some companies that they do not hire people with back injuries like his.

Defendants introduced a letter sent to Plaintiff approximately 3½ months prior to trial by Joseph Santamaria, a shop superintendent, offering to let him return to work as a boilermaker. Santamaria's letter stated, in part:

> I have recently received information from your doctor, George Schoedinger, M.D., of St. Louis, Missouri, stating the definition of the restriction, 'unrestricted or no heavy industrial activity,' means in your case that you would not lift in excess of 50 pounds frequently in your employment. He further states that you should avoid prolonged, excessive unrestricted lifting or use of your upper limbs above the level of your neck or shoulder girdle. He also stated that the restrictions such as bending, stooping, squatting, and other activities of this type would not apply in cervical cases such as yours.
>
> With the present understanding we have from your doctor, we are able to accommodate your restrictions to place you back in your present position as a boilermaker at Jenks Shop. Would you please make arrangements to report to your facility so that we might arrange for a return-to-work examination in accordance with our regulations.

Dr. Schoedinger confirmed at trial that the letter accurately reflected the work restrictions he had placed on Plaintiff and stated that he had no medical objection to Plaintiff returning to work so long as he complied with the restrictions. However, Dr. Schoedinger stated that he had no knowledge of whether there were any boilermaker jobs available which could accommodate such restrictions.

Plaintiff replied to Mr. Santamaria's letter stating he believed that returning to a boilermaker job would be inconsistent with his doctors' medical advice. He explained that he knew from his many years of experience as a boilermaker that the job required heavy lifting and a lot of work above the shoulders. He suggested that Mr. Santamaria speak to other boilermakers to learn the physical requirements of the job. Plaintiff concluded his letter stating that he hoped to find some type of work in the future but did not want to injure himself or make his condition worse or ignore the advice of his doctors.

At trial, Plaintiff established that Mr. Santamaria did not write the letter to Plaintiff and prior to signing it he had not consulted with any medical personnel at the railroad. He was also unaware of the physical examination requirements for boilermakers and had never reviewed the job description in the union agreement. Mr. Santamaria conceded at trial that orthopedic surgery was a disqualifying condition according to the physical examination manual but felt that he had sufficient flexibility to work around those guidelines. He also agreed that seniority generally prevailed in the selection of particular jobs but felt that Plaintiff could be accommodated in cooperation with the union. Numerous other witnesses testified to the rigorous nature of the boilermaker job and the types of work activities required. Defendants did not offer any medical evidence.

Defendants' first contention is that the trial court erred in refusing their tendered instruction on mitigation of damages. This issue was raised as an affirmative defense in Defendants' answer.

Defendants correctly point out that questions concerning the measure of damages in an FELA action are federal in character, even if the action is brought in state

court. *Norfolk & Western Ry. Co. v. Liepelt*, 444 U.S. 490, 493, 100 S.Ct. 755, 757, 62 L.Ed.2d 689, 693 (1980). Normally, in an FELA action, a plaintiff is entitled to recover the difference between what he was able to earn before the injury and what he earned or could have earned thereafter. *Trejo v. Denver & R.G.W.R. Co.*, 568 F.2d 181, 184 (10th Cir.1977). Thus, an employee must exercise reasonable effort to secure gainful employment; a loss of wages due to the failure to do so is the employee's choice rather than a proximate result of the defendant's conduct. *See id.* A claim that the plaintiff failed to act reasonably in mitigating his damages is an affirmative defense. *Bissett v. Burlington Northern R. Co.*, 969 F.2d 727, 731 (8th Cir.1992). If there is evidence to support a failure to mitigate damages, the party asserting the defense is entitled to an instruction on the issue. *Trejo*, 568 F.2d at 184.

■ The propriety of jury instructions concerning the measure of damages in an FELA action is an issue of substance determined by federal law. *St. Louis Southwestern Ry. Co. v. Dickerson*, 470 U.S. 409, 411, 105 S.Ct. 1347, 1348, 84 L.Ed.2d 303, 306 (1985). Thus, the fact that an instruction on a given subject is not to be found in MAI is not dispositive because the issue of whether an instruction should be given is a federal question. *Id.*

Plaintiff does not dispute that, if properly supported by the evidence, Defendants are entitled to submission of a proper instruction on mitigation of damages. Plaintiff maintains, however, that the instruction was properly refused in this case because, *inter alia*, (1) MAI 8.02, the damages instruction given in the case, already encompasses mitigation by limiting damages to an amount that will "fairly and justly" compensate the plaintiff for damages sustained as a result of the occurrence; (2) Defendants' tendered instruction did not conform to the requirements for Not-in-MAI instructions because it is an incorrect, incomplete, argumentative and abstract statement of law; and (3) the instruction was not supported by the evidence. We find it unnecessary to address

Plaintiff's first contention because even if we were to conclude that Defendants were entitled to submit a separate instruction on mitigation of damages, we would still be constrained to find that the mitigation of damages instruction tendered by Defendants was properly refused.

■ Although the United States Supreme Court held in *Dickerson* that the mere fact that an instruction is not found in MAI is not determinative of the federal question of whether an instruction should be given, we do not interpret the holding of *Dickerson* to be that the Defendant is thereby entitled to submit the issue by whatever manner it pleases. *Dickerson* expressly acknowledged that FELA cases adjudicated in state courts are generally subject to state procedural rules. 470 U.S. at 411, 105 S.Ct. at 1348. Rule 70.02(e) contains specific guidelines for submission of Not-in-MAI instructions in situations where a party maintains that there is no applicable MAI instruction or that an existing MAI instruction requires modification. Those guidelines require that the tendered instruction be simple, brief, concise and free from argument. Rule 70.02(e). In addition, instructions which submit only abstract statements of the law requiring no findings by the jury are improper. *Turner v. Norfolk & Western Ry. Co.*, 785 S.W.2d 569, 573 (Mo.App.1990).

■ At the instruction conference, Defendants offered and the trial court refused the following instruction:

Plaintiff after his injury was required by law to use reasonable efforts to eliminate or reduce any loss of earnings resulting from his injury by taking advantage of reasonable employment opportunities available to him.

Assuming *arguendo* that Defendants were entitled to submit a separate, Not-in-MAI instruction on mitigation of damages, the instruction tendered by Defendants clearly fails to satisfy the well-established requirements for submission of Not-in-MAI instructions. It is purely an abstract statement of law[1] in that it does not require any finding

---

1. In view of our disposition, we need not reach

or address Plaintiff's contention that it is not a

by the jury or inform the jury of how the information set forth in the instruction is to impact any finding they are to make. It provides no guidance with respect to which party bears the burden of proof. It is argumentative in purporting to inform the jury of what is "required by law." Further, to the extent that the instruction states that Plaintiff was required to undertake efforts "to eliminate ... any loss of earnings," the instruction was not supported by the evidence. Defendants did not introduce any evidence that Plaintiff could have eliminated any loss of earnings. At best, the evidence would have supported a determination that Plaintiff could have reduced or ended his loss of earnings by accepting Defendants' offer to return to work after his surgery. Accordingly, we find no error in the trial court's refusal of the mitigation of damages instruction tendered by Defendants.

■ Defendants' second contention is that the trial court erred in refusing to modify the verdict directing instruction, MAI 24.01, to insert a separate paragraph requiring a finding that "defendants knew or by using ordinary care could have known of such condition, and that such condition was reasonably likely to cause substantial harm." Defendants maintain that the Notes on Use following MAI 24.01 require the addition of such language under the circumstances presented, citing *Qualls v. St. Louis Southwestern Ry. Co.*, 799 S.W.2d 84, 86–87 (Mo. banc 1990). We disagree.

The Notes on Use following MAI 24.01 provide in relevant part:

> In the event plaintiff submits some act of negligence, constructive knowledge of which is not chargeable to the railroad, there shall be submitted in addition a paragraph providing "Second, conditions for work were not reasonably safe and defendant knew or by using ordinary care could have known of such conditions and that they were not reasonably safe, and".... 

In *Qualls*, the Missouri Supreme Court interpreted this language to mean that "the judge must decide whether the plaintiff has

complete or correct statement of the law even under the authority relied upon by Defendants, *Brown v. Chicago & North Western Transp. Co.*,

presented sufficient evidence to justify not submitting the issue to the jury. If the judge decides the plaintiff has shown defendant had actual knowledge of the negligently produced condition, the additional paragraph is not required." *Qualls*, 799 S.W.2d at 87 (citing *Foltz v. Burlington N.R.R.*, 689 S.W.2d 710, 715 (Mo.App.1985)).

The facts in *Qualls* are illustrative of the situations in which the additional paragraph should be given. In that case, an employee was dispatched with a work crew to work on a section of track. It was a cold day and there was snow and ice on the ground. The work crew was taken by bus to a point about a mile from where they were to work. From there, Qualls and his fellow workers began to walk along the railroad right of way to the work site. Qualls became separated from the work group and, as he was attempting to rejoin the crew, he slipped and fell on an open deck bridge and hurt his back. There was conflicting testimony as to the extent of the accumulation of ice and snow and whether the bridge was slippery. The Missouri Supreme Court held that this conflicting testimony was sufficient to present an issue of fact as to defendant's actual or imputed knowledge of the condition and affirmed the trial court's granting of a new trial for its failure to modify MAI 24.01 to submit the issue. *Id.*

*Foltz*, cited with approval in *Qualls*, illustrates the circumstances in which MAI 24.01 need not be modified. In *Foltz*, a switchman injured his back while manually throwing a switch. The plaintiff testified that he had reported difficulty in operating the switch to his foreman five days before his injury and another employee testified that he had also experienced difficulty with the switch and had reported it to his foreman. Noting that knowledge of a defendant's employee is usually knowledge of the defendant, the court held such evidence sufficient to show defendant had actual or, at the very least, constructive knowledge of the condition. 689 S.W.2d at 715–16.

162 Ill.App.3d 926, 114 Ill.Dec. 165, 169–71, 516 N.E.2d 320, 324–26 (1987).

In this case, there is ample evidence that Defendants had actual knowledge of the conditions which led to Plaintiff's injury. Defendants are surely charged with knowledge of the physical dimensions and location of the bolts on their own locomotives which have been in service and regularly repaired for many years prior to Plaintiff's injury. Defendants' corporate designee, Mr. Jacobs, admitted that the bolt that Plaintiff was attempting to install was located 89 inches off the ground, 36 inches inward, and that there was very little space inside the locomotive to work when tightening this bolt. He conceded that company policy required that every bolt on the GP–38 be installed and tightened. Plaintiff's work partner, Zulfer, testified that there was no safer way to place the bolt and that he had used the same procedure himself. He further opined that the procedure could not safely be performed with a ladder due to the distance from the ladder to the center bolt, making it likely that the ladder would tip. There was also evidence that center bolts were missing or not fully seated on this model of locomotive, further suggesting the difficulties encountered by employees in placing them.

Thus, unlike the situation in *Qualls*, the dangerous situation encountered by Plaintiff was not of recent origin; it was inherent in the design of the locomotive. There was simply no dispute that Defendants knew of the space constraints inside the locomotive, the height and distance of the bolt, and that their own policy required that all bolts be tightened. Other employees were aware of, and had employed, the procedure of climbing inside the narrow space and lying in an awkward position to place the bolts—*i.e.,* the specific practice which led to Plaintiff's injury. Such knowledge is chargeable to Defendants. *Foltz,* 689 S.W.2d at 716; *Wiser v. Missouri Pacific Railroad Co.,* 301 S.W.2d 37, 41 (Mo.1957). We find that this evidence was sufficient to show that Defendants had actual or constructive notice of the condition which led to Plaintiff's injury. Accordingly, we find no error in the trial court's refusal of Defendants' requested modification of MAI 24.01.

Defendants' third point posits error in the admission of testimony of Plaintiff and his wife concerning Plaintiff's suicidal thoughts and actions. Defendants assert that there was no medical evidence that Plaintiff had such problems or that they were related to his physical injury. We disagree.

Dr. Bernstein specifically testified that Plaintiff exhibited typical symptoms of depression, feelings of worthlessness and suicidal thoughts "because of what has happened to him as a man." Virtually identical testimony has been held sufficient for submission of mental distress as an element of damages in an FELA case. *Dickerson v. St. Louis Southwestern Ry. Co.,* 674 S.W.2d 165, 172–73 (Mo.App.1984), *rev'd on other grounds sub nom St. Louis Southwestern Ry. Co. v. Dickerson,* 470 U.S. 409, 105 S.Ct. 1347, 84 L.Ed.2d 303 (1985). Plaintiff's and his wife's testimony, which followed Dr. Bernstein's, merely provided foundation. The fact that Dr. Bernstein did not consider Plaintiff's suicidal ideation sufficiently serious to warrant further psychological treatment does not render the mental distress suffered by Plaintiff any less real or less compensable. Plaintiff did not seek to recover future medical expenses for psychological treatment. Further, we believe that this testimony would have been admissible as evidence of Plaintiff's mental state which, as discussed below, was clearly placed in issue by Defendants. We find no abuse of discretion in admitting the subject testimony. Defendants' third point is denied.

Defendants' final contention is that the trial court erred in allowing Plaintiff's counsel to discuss and Plaintiff to testify about his status as a "family provider," the members of his family, and the fact that his son had to forego his education to support his family. Defendants maintain that such evidence was irrelevant and calculated solely to appeal to and inflame the jury's emotions. We disagree.

From our review of the transcript, it is clear that Defendants elected from the outset of the trial to attempt to paint Plaintiff as a "malingerer," thus squarely placing Plaintiff's mental state in issue. Although Defendants are correct that evidence of a plaintiff's family status is inadmissible for the purpose of engendering sympathy or obtaining compensation beyond what is fair and just, this

does not mean that such evidence is always inadmissible for any purpose. Here, the evidence of Plaintiff's work history, sense of family obligation and responsibility, and feelings of worthlessness (related directly to his injury by competent medical evidence), if believed by the jury, supported an inference by the jury that Plaintiff's mental state was incompatible with Defendants' charge of malingering. We agree with Plaintiff that Defendants cannot have it both ways, attacking Plaintiff's motives and then objecting to testimony which explains his motives and emotions, rebutting the attack.

Further, we note that, for the most part, Defendants' "objections" to this evidence were articulated either by motions in limine, which preserve nothing for review, or by motions for mistrial, well after the evidence was admitted without contemporaneous objection. The necessity of a mistrial is a drastic remedy resting in the sound discretion of the trial court with which we will not interfere absent manifest abuse. *Hoene v. Associated Dry Goods Corp.*, 487 S.W.2d 479, 485 (Mo.1972). We find no abuse of discretion in this instance, manifest or otherwise.

The judgment is affirmed.

CARL R. GAERTNER, P.J., and CRANE, J., concur.